1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

NORTHERN DISTRICT OF CALIFORNIA

8

PHOENIX SOLUTIONS INC.,

9
                    Plaintiff,

10
      v.

11
 WELLS FARGO BANK, N.A., and WELLS
12 FARGO FUNDS MANAGEMENT, LLC.,

13
                    Defendants.

14 ――――――――――――――――――――――――/

No. C 08-00863 MHP

**MEMORANDUM & ORDER**

**Re: Matters Related to Discovery Motions**

15        Phoenix Solutions, Inc. ("Phoenix") brought this action against Wells Fargo Bank, N.A.

16 ("Wells Fargo") for infringement of U.S. Patent Nos. 6,633,846, 6,665,640, 7,050,977, and

17 7,277,854 (collectively, "patents-in-suit") directed to "speech recognition software."  During the

18 course of discovery, Phoenix voluntarily produced documents relating to the drafting of the patents-

19 in-suit, including communications between a named inventor and the prosecuting attorney.  Phoenix

20 later requested that the prosecuting attorney be permitted access to confidential material under the

21 protective order.  Wells Fargo requested that Phoenix produce all documents related to the

22 prosecution of the patents-in-suit, as well as certain "warning" or "cease and desist" letters sent to

23 third parties and Phoenix refused on privilege grounds.  Now before the court is the issue of the

24 scope of waiver of attorney-client privilege, the appropriate protective order provisions, and any

25 applicable "settlement" privilege as to the requested documents.  Having considered the parties'

26 arguments and briefs, and for the reasons detailed below, the court enters the following

27 memorandum and order.  This order serves to memorialize and supplement the court's partial oral

28 ruling on the appropriate scope of waiver during the telephonic conference with the parties on

September 11, 2008.

**United States District Court**
For the Northern District of California

BACKGROUND

I.        The Scope of Waiver Issue

         The facts relevant to the instant motion were reviewed in part during the September 11th telephonic conference and therefore, only a summary is necessary here.  Several months ago, Phoenix served its Initial Disclosures on Wells Fargo pursuant to Federal Rule of Civil Procedure 26(a).  Contained within that production were several drafts of the specification of the patents-in-suit prior to the filing date of the applications in the U.S. Patent and Trademark Office ("USPTO") and several documents reflecting communications between a named inventor on the patents and Phoenix's principal, Dr. Ian Bennett, and J. Nicholas Gross, outside patent counsel, relating to the drafting of the applications prior to filing, which eventually issued as the patents-in-suit.  Trojan Dec. Re Scope of Waiver ("First Trojan Dec."), ¶ 2, Exh. 1.  The  communications included emails discussing the receipt of documents to consider when drafting the patent application, emails discussing drafts and revisions of the specification portion of the application, and comments in the drafts that suggest making reference to certain patents, articles and prior art references.  Id. at PHO006213–6216, PHO006219-6351.

         As a result of that production, Wells Fargo requested that Phoenix produce all such communications between Dr. Bennett and attorney Gross.  Joint Case Management Statement 2:17-21. Phoenix refused, on the grounds of attorney-client privilege.  Id.  Wells Fargo now claims that Phoenix has waived the privilege for all communications on the subject matter of the substance of the disclosed documents, including that which relates to:  (1) the drafting and editing of the specification of the patents, including the scope and content of the prior art; (2) the inventorship of the patents; (3) the novelty of the patents; (4) how to uncover prior art, (5) how prior art applies to the invention; and (6) how to draft the claims to avoid prior art.  See First Trojan Dec. ¶ 3, Exh. 2; Maitra Dec., Exh. 5.

         Phoenix argues that Wells Fargo's request should be denied because it is overly broad and seeks waiver for documents that are clearly privileged and outside the scope of any subject matter waiver of such privilege.  Specifically, Phoenix contends that attorney-client communications after the filing date of the patent applications that issued as the patents-in-suit and drafts of the patent claims (either pre-filing drafts of claims or post-filing claim amendments made during prosecution)

2

**United States District Court**
For the Northern District of California

1  are outside the scope of any subject matter waiver based on the original production of

2  communications that predated the filing of the patent applications.  Phoenix contends that the scope

3  of waiver should be limited to documents that relate to the drafting and editing of the specification of

4  the patents-in-suit and related communications that deal with matters prior to the filing of the patent

5  applications.  Wells Fargo disagrees with any proposed temporal limitation to the subject matter

6  waiver.  Maitra Dec., Exhs. 5-7.

7  II.    The Protective Order Issue

8       A second issue raised by Wells Fargo during the September 11, 2008 telephonic conference

9  concerns the terms of a stipulated protective order.  The parties have come to an impasse on one

10  provision of a protective order proposed by Wells Fargo and request court intervention.  During

11  negotiations of a stipulated protective order, Phoenix requested that its outside patent prosecution

12  counsel be granted access to all information, including "attorney's eyes only" highly confidential

13  information.  Joint Case Management Statement 1:18-20.  Gross has been Phoenix's only counsel on

14  patent matters for the past nine years: he prosecuted the four patents-in-suit as well as other related

15  patents and he continues to prosecute continuation applications of the patents-in-suit.  Id., 1:20-21,

16  26-28; Gross Dec. ¶ 2; Paige Dec. Re Protective Order ("First Paige Dec.") ¶¶ 2-3.

17       Phoenix's position is that Gross' input is needed to provide assistance in making strategic

18  decisions about this litigation.  Gross Dec. ¶ 4.  Phoenix asserts that it would be greatly prejudiced if

19  denied the ability to meaningfully rely on the service of its sole patent prosecutor.  Bennett Dec. ¶ 3.

20  Phoenix contends that Wells Fargo would not be prejudiced because it purportedly has no intellectual

21  property in the area of speech recognition that could be compromised by Gross' involvement and that

22  Wells Fargo's ability to compete in the banking industry would not be impacted by granting Gross

23  access to its confidential information in this case.  See Trojan Dec. Re Protective Order ("Second

24  Trojan Dec."), Exh. 2; Gross Dec. ¶ 5.

25       Wells Fargo opposes Phoenix's request and argues that the protective order should have a

26  prosecution bar.  Wells Fargo asserts that Gross performs the functions that an in-house patent

27  prosecution counsel would perform for Phoenix.  First Paige Dec., Exh. A at 3:5-12, 5:12-17.  Wells

28  Fargo also asserts that Gross has written several letters to Wells Fargo seeking to induce Wells Fargo

3

United States District Court

For the Northern District of California

1   to take a license to the Phoenix patents and stating that several of Phoenix's pending patent

2   applications appear to have claims that read upon the system Wells Fargo uses.  Id., Exh. B at 3.

3   Wells Fargo's position is that Phoenix should not be granted access to confidential information about

4   its system that Gross could use in his continued prosecution of Phoenix patents, e.g., to try to draft

5   claims in pending patent applications expressly to cover Wells Fargo's system, so as to assert future

6   Phoenix patents against Wells Fargo.  Wells Fargo indicated that it would be willing to allow Gross

7   access to the requested documents if Gross agreed to cease prosecuting patents for Phoenix during the

8   litigation and for a period of one year thereafter.  Joint Case Management Statement 2:14-16; Def.'s

9   Brief on Appropriate Protective Order Provisions 7:2-5; Second Trojan Dec., Exh. 1.

10  III.    The "Settlement" Privilege Issue

11          Wells Fargo initially raised a supplemental issue in its scope of waiver brief concerning the

12  nondisclosure and asserted privilege by Phoenix relating to communications between Phoenix and

13  various third parties, namely, communications accusing third parties of infringing the patents-in-suit.

14  See Maitra Dec., Exh. 3.  Wells Fargo does not believe there is any basis to exclude such "dunning

15  letters" or "cease and desist letters" from production and requested that the court order that Phoenix

16  turn over such documents, as well as all documents with third-party companies relating to license

17  negotiations concerning the patents-in-suit, including Phoenix's stipulation with Intervoice, Inc.

18  ("Intervoice") in the related Phoenix v. Sony case, 3:07-cv-002112-MHP.  During the September 11,

19  2008 telephonic conference with the parties, the court ordered that Phoenix turn over the initial

20  letters, along with a privilege log and requested that the parties brief the issue with respect to other

21  documents.

22          Shortly thereafter, Phoenix timely produced a privilege log to Wells Fargo.  Paige Dec. Re

23  Settlement Privilege ("Second Paige Dec.") ¶ 5, Exh. 4.  Phoenix also timely produced various letters

24  to third parties reflecting offers to license certain of Phoenix's patents.  Id., ¶¶ 6-7, Exh. 5.  Wells

25  Fargo asserted that Phoenix should disclose all other communications between Phoenix and third

26  parties relating to Phoenix's enforcement of the patents-in-suit currently listed as privileged in

27  Phoenix's log, including all aforementioned responsive communications with Intervoice.  Wells

28  Fargo contends that all of the withheld documents that share the same privilege log description of

4

United States District Court
For the Northern District of California

1  "letter re: license offer" or "email re: license offer" with the asserted privilege of "settlement" should

2  be ordered disclosed,  barring any evidence that any of the withheld documents differ from the

3  already produced invitations to negotiate.[1]

4       Phoenix states that it is in negotiations with over thirty companies regarding license offers

5  related to the patents-in-suit.  Trojan Dec. Re Settlement Privilege ("Third Trojan Dec.") ¶ 2, Exh. 1.

6  Phoenix states that it has already produced the only license agreement relating to its patents-in-suit,

7  signed by Sony.  Id., ¶ 3.  Phoenix draws a distinction between license/settlement agreements and

8  settlement negotiations, and asserts that documents relating to the negotiations of settlement do not

9  impact on substantive patent issues and have no probative value.  Phoenix asserts that it need only

10  produce the license agreements from the cases it has settled and that it has no obligation to disclose

11  communications from any other third parties prior to reaching an agreement and signing a license

12  with such parties.  Third Trojan Dec. ¶ 3.  Phoenix's position is that all documents relating to

13  settlement negotiations are: (1) protected from discovery based on a "settlement privilege," whose

14  policy is embodied in Federal Rule of Evidence 408; and (2) generally not relevant to other litigation

15  because any positions taken by the parties prior to any final agreement are insignificant and intrusive

16  and will likely not constitute admissible evidence.

17

18  LEGAL STANDARD

19  I.    Scope of Discovery

20       "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the

21  claim or defense of any party . . . ."  Fed. R. Civ. P. 26(b)(1).  The Rule goes on to state that "[f]or

22  good cause, the court may order discovery of any matter relevant to the subject matter involved in the

23  action.  Relevant information need not be admissible at the trial if the discovery appears reasonably

24  calculated to lead to the discovery of admissible evidence."  Id.  The scope of discovery permissible

25  under Rule 26 should be liberally construed; the rule contemplates discovery into any matter that

26  bears on or that reasonably could lead to other matter that could bear on any issue that is or may be

27  raised in a case.  Board of Trustees of Leland Stanford Junior University v. Roche Molecular

28  Systems, Inc., 237 F.R.D. 618, 621 (N.D. Cal. 2006) (Patel, J.).  However, the broad scope of

5

1  permissible discovery is limited by any relevant privileges, including the attorney-client privilege.

2  See Fed. R. Civ. P. 26(b)(1).  Any proposed privilege must promote a public interest that is

3  "sufficiently important . . . to outweigh the need for probative evidence."  Trammel v. United States,

4  445 U.S. 40, 51 (1980).  The recognition of a privilege should be judged on a case-by-case basis and

5  weighed against the public interest.  Jaffee v. Redmond, 518 U.S. 1, 8 (1996).

6       The scope of discovery is also constrained by Rule 26(c), which explicitly authorizes the

7  district court to protect parties from "undue burden or expense" in discovery by ordering "that a trade

8  secret or other confidential research, development, or commercial information not be disclosed or be

9  disclosed only in a designated way."  Fed. R. Civ. P. 26(c)(7).  To obtain a protective order, the party

10  resisting discovery or seeking limitations must show "good cause" for its issuance.  Fed. R. Civ. P.

11  26(c).  The burden of demonstrating the need for protection from discovery is placed on the party

12  seeking a protective order, not on the party opposing the order.  Id.

13  II.     Attorney-Client Privilege

14       Confidential information disclosed by a client to an attorney to obtain legal assistance is

15  protected by the attorney-client privilege.  Fisher v. U.S., 425 U.S. 391, 403 (1976); American

16  Standard Inc. v. Pfizer Inc., 828 F.2d 734, 745 (Fed. Cir. 1987).  An attorney's communications to a

17  client may also be protected by the privilege, to the extent that they contain or are based on

18  confidential information provided by the client, or legal advice or opinions of the attorney.  U.S. v.

19  Margolis, 557 F.2d 209, 211 (9th Cir.1977).  The purpose of the attorney-client privilege is to

20  encourage "full and frank communication between attorneys and their clients and thereby promote

21  broader public interests in the observance of law and the administration of justice."  Upjohn Co. v.

22  United States, 449 U.S. 383, 389 (1981).  As a general matter, "[a] party is not entitled to discovery

23  of information protected by the attorney-client privilege."  Navajo Nation v. Confederated Tribes &

24  Bands of the Yakama Indian Nation, 331 F.3d 1041, 1046 (9th Cir. 2003), citing Wharton v.

25  Calderon, 127 F.3d 1201, 1205 (9th Cir. 1997).

26       The attorney-client privilege is not absolute.  It may be waived "either implicitly, by placing

27  privileged matters in controversy, or explicitly, by turning over privileged documents."  Gomez v.

28  Vernon, 255 F.3d 1118, 1131 (9th Cir.), cert. denied, Beauclair v. Puente Gomez, 534 U.S. 1066

United States District Court

For the Northern District of California

1  (2001).  "The doctrine of waiver of the attorney-client privilege is rooted in notions of fundamental

2  fairness."  Tennenbaum v. Deloitte & Touche, 77 F.3d 337, 340 (9th Cir. 1996).  "Its principal

3  purpose is to protect against the unfairness that would result from a privilege holder selectively

4  disclosing privileged communications to an adversary, revealing those that support the cause while

5  claiming the shelter of the privilege to avoid disclosing those that are less favorable."  Id. at 340–41

6  (citing 8 J. Wigmore, Evidence § 2327, at 636 (McNaughton rev. 1961)).  The disclosure of

7  confidential information resulting in the waiver of the attorney-client privilege constitutes waiver of

8  privilege as to communications relating to the subject matter that has been put at issue.  See Winbond

9  Electronics Corp v. Int'l Trade Comm'n, 262 F.3d 1363, 1376 (Fed. Cir. 2001).

10  III.    Scope of Waiver

11         When either privilege is waived, its scope extends to "all communications on the same subject

12  matter . . . so that a party is prevented from disclosing communications that support its position while

13  simultaneously concealing communications that do not."  Stanford v. Roche, 237 F.R.D. 618, 625

14  (N.D. Cal. 2006) (Patel, J.).  This court has further stated that "[t]here is no bright line test for

15  determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of

16  the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or

17  prohibiting further disclosures."  Id.  The burden of establishing the existence of the privilege

18  remains on the person asserting it.  See In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447,

19  450 (6th Cir. 1983) (collecting citations).

20

21  DISCUSSION

22  I.    Scope of Waiver

23         Wells Fargo seeks the following categories of documents, relating to the subject matter of: (1)

24  editing and drafting of the specification of the patents, including the scope and content of the prior

25  art; (2) inventorship of the patents; (3) novelty and/or innovation of the patents; (4) how to uncover

26  prior art; (5) how prior art applies to the invention; and (6) how to draft the claims to avoid prior art.

27         Phoenix acknowledges that it produced the original documents, i.e., drafts of patent

28  applications and related communications, voluntarily and not inadvertently and that attorney-client

**United States District Court**
For the Northern District of California

1  privilege as to those documents had been waived as a result.  The court appreciates that the parties are

2  in agreement that the voluntary disclosure of the attorney communication constituted a waiver of the

3  privilege as to all other such communications on the same subject matter.  This is, of course, black

4  letter law.  However, Phoenix disputes the scope of the subject matter waiver, arguing that it was

5  narrowly constrained to those documents that had already been produced and those documents alone.

6  Phoenix asserts that Federal Circuit law controls a determination of the proper scope of waiver.

7  Indeed, because drafts of patent applications and communications relating to the preparation of filing

8  patent applications concern discovery issues that occur in the unique context of patent litigation, the

9  court finds that Federal Circuit law appropriately applies to the scope of waiver of this particular

10  subject matter.  See In re EchoStar Commons. Corp., 448 F.3d 1294, 1298 (Fed. Cir. 2006).

11  However, the issue of waiver itself and the scope of that waiver as it applies to other documents does

12  not fall exclusively in the realm of patent law and therefore the court will consider Ninth Circuit law

13  for that determination.  See GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1272 (Fed. Cir. 2001)

14  (holding that waiver of privileged information is not a substantive patent issue and regional circuit

15  law applies).

16       Wells Fargo argues that Phoenix has attempted to use the disclosed drafts and other

17  documents as both a shield and a sword, that is, to reveal a limited aspect of privileged

18  communications in order to gain a tactical  advantage in litigation.  If this were the case, Phoenix

19  would have broadly waived the privilege as to all other communications relating to the same subject.

20  See, e.g., Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1351 (Fed. Cir. 2005), citing In re Grand

21  Jury Proceedings, 78 F.3d 251, 255 (6th Cir. 1996) and Matter of Continental Illinois Securities

22  Litigation, 732 F.2d 1302, 1314 n.18 (7th Cir. 1984).  However, it is not apparent on these facts that

23  Phoenix made the initial disclosures to obtain any advantage or that such disclosure has advantaged

24  Phoenix in any manner.  Moreover, the authorities on which Wells Fargo relies only confirm the

25  general premise that the waiver applies to the rest of the communications on the same subject matter;

26  they do not define the scope of the subject matter, which is the issue at hand.

27       Phoenix's attorney argument that it did not subjectively intend to waive the privilege as to any

28  documents beyond those which have been already disclosed is unpersuasive to make out the

United States District Court

For the Northern District of California

1  necessary element of nonwaiver.  It is well settled that a party's failure to protect its privilege can

2  result in a loss or conscription of that privilege.  Fort James Corp, 412 F.3d at 1351, citing Dellwood

3  Farms, Inc. v. Cargill, Inc., 128 F.3d 1122, 1126 (7th Cir. 1997).  This court finds the objective fact

4  that Phoenix voluntarily disclosed certain drafts of patent applications dispositive in determining that

5  there has been a subject matter waiver as to all drafts of those patent applications.  See id., citing In re

6  Martin Marietta Corp., 856 F.2d 619, 623 (4th Cir. 1988) (stating that "if a client communicates

7  information to his attorney with the understanding that the information will be revealed to others, that

8  information as well as 'the details underlying the data which was to be published' will not enjoy the

9  privilege").  Phoenix's assertions that:  (1) it had already produced all written communications

10  relating to the drafting of the written description and (2) "it is clear from the documents produced that

11  Phoenix made no attempt to conceal unfavorable documents" are inadequate.  See Pl.'s Brief Re

12  Scope of Waiver at 4.  Phoenix has already produced pre-filing drafts of the written description

13  portions of the patents-in-suit, not just communications relating to those drafts.  Accordingly,

14  Phoenix must produce all drafts of those applications, irrespective of whether they contain additional

15  written comments on them.  This  includes all drafted and edited (e.g., red-lined) portions of the

16  patent specification, including the background section, the summary of the invention, the figure

17  legends and the detailed description section, up to the date of filing the patent application(s) with the

18  USPTO.  Because Phoenix's voluntary production was limited to the specification portion of the

19  applications which contained no patent claims, however, the court will not order Phoenix to produce

20  any pre-filing drafts of the claims themselves.

21        Phoenix must also produce all written communications relating to the drafting of the patents-

22  in-suit.  The court is unclear as to the intended impact of Phoenix's position that it has already

23  produced all of its pre-filing communications since "most of the information found in the

24  communications was already disclosed to the public in the patent application."  Id. at 4:4-5.  If this

25  statement is Phoenix' way of attempting to circumvent the production of the actual e-mails between

26  the prosecuting attorney and the inventor concerning the drafts, it is unacceptable.  The court knows

27  of no authority supporting Phoenix' proposition made during the September 11 telephonic conference

28  that drafts of patent applications become part of the public record when a patent application is filed.

9

United States District Court

For the Northern District of California

1   See Transcript of Proceedings, Docket No. 82 ("Tr."), at 9:5-7.  Accordingly, the court finds it

2   necessary to make clear that those drafts must be produced because of a waiver of the attorney-client

3   privilege in this case and not any alleged and ill-founded public disclosure requirement.

4        The court likewise fails to comprehend Phoenix's nonsensical argument that the already

5   produced documents make clear that Phoenix has not attempted to conceal unfavorable documents.

6   One action does not speak to the other, unless Phoenix is trying to make an admission that it

7   considers the already disclosed documents to be harmful to Phoenix, which the court doubts.

8   However, neither does the court agree with the other end of the spectrum, asserted by Wells Fargo,

9   that Phoenix's disclosure of the specification drafts without the claim drafts shows that Phoenix has

10   chosen to produce only those communications that favor Phoenix.[2]  To reiterate, the court does not

11   find, on these facts, that Phoenix made the initial disclosures to obtain any benefit or that such

12   disclosure has benefitted or will benefit Phoenix in this litigation and will not extend the scope of

13   waiver on that basis.

14        In addition to patent application drafts, the court finds that Phoenix's voluntary disclosure of

15   communications between the inventor Bennett and the patent prosecutor Gross discussing specific

16   references waived the attorney-client privilege by placing those communications at issue in this

17   litigation.  The voluntarily produced communications refer to the prior art and the relevance of the

18   prior art to specific portions of the specification of the patents-in-suit.  See, e.g., First Trojan Dec.,

19   Exh. 1 at PHO006274 ("Here we might mention Dragon, Via-Voice, etc.") and PHO006274 ("Here

20   we should talk about Qualcomm and GTE prior art on distributed processing.").  Given those prior

21   disclosures, it would be unreasonable for counsel to have reasonably expected that subsequent

22   communications concerning those specific references would be assumed to have remained in

23   confidence.  See, e.g., Weil v. Investment/Indicators, Research & Management, Inc., 647 F.2d 18, 24-

24   25 (9th Cir. 1981) (explaining the general principle that disclosure does not necessarily amount to

25   waiver of the privilege but it does extinguish the element of confidentiality that one must show in

26   order to claim the privilege).  The court finds that the subject matter waiver, in terms of a loss of

27   expected confidentiality, reasonably extends to all further documents or communications between the

28   named inventor and the prosecuting attorney pre- and post-filing, i.e., throughout the prosecution of

the patent applications, concerning any of the prior art documents specifically identified by name in the previously disclosed documents. This waiver extends to all references that are discussed or mentioned in patent application drafts or other communications between Dr. Bennett and Gross. The mention need not qualify as a substantive discussion of that prior art for the waiver to apply; a mere listing of the document by name in a sentence is enough to waive that communication and any direct responses thereto. However, if said references were named merely by being listed as an attachment to a written communication and are not discussed elsewhere in the communication, the waiver does not extend to those communications or attachments.

Aside from specifically named references, the subject matter waiver is of limited temporal nature. The court is mindful that too broad an application of the rule of waiver requiring unlimited disclosure could very well destroy the purpose of the privilege itself. See, e.g., Weil, 647 F.2d at 25 (finding waiver "only as to communications about the matter actually disclosed"). The court will not hold the waiver to extend to all communications relating to prior art references between the inventor and the attorney. At issue, therefore, is the temporal scope of the partial waiver. The court finds it is a reasonable belief that the disclosure of communications and documents related to the prosecution of the patents-in-suit between the inventor and the attorney be made within the confines of the attorney-client relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence. Accordingly, Phoenix did not waive any privilege with respect to post-filing materials, including communications regarding the prosecution of the patent applications, analysis of the rejections by the Examiner, strategies for claim amendments, drafts of actual claim amendments and related arguments, etc. Although such documents may well be at the heart of one of the disputes between the parties, as Wells Fargo contends, that fact is not dispositive. There is a fundamental divide between patent drafting and patent prosecution that cannot reasonably be bridged by the extension of a waiver, at least on the facts in this case.

With respect to the other categories of documents for which Wells Fargo asserts the privilege has been waived, the court does not find waiver as to any documents that specifically relate to the inventorship of the patents or the novelty and/or innovation of the patents. The court does find a waiver, however, of documents relating to general methodology for uncovering prior art and

1   processes for searching and discovering prior art and how to draft the claims to avoid prior art, based

2   on the voluntary disclosure of documents relating to this subject matter.  See, e.g., First Trojan Dec.,

3   Exh. 1 at PHO006215.   This waiver does not open the door, however, to substantive discussions of

4   how a particular prior art reference applies to the invention unless that specific reference has been

5   identified by name, and then all communications regarding that prior art reference must be disclosed.

6         In summary, the court finds that Phoenix did not waive any privilege with respect to either

7   pre- or post-filing drafts of the claims themselves, nor did Phoenix waive any privilege with respect

8   to post-filing strategy and analysis regarding the prosecution of those claims, except for specific

9   instances in which the previously disclosed named prior art is discussed or referenced.  The court

10  hereby orders Phoenix to produce all responsive documents within the scope of the waiver so defined.

11  II.      Protective Order

12        Rule 26(c) of the Federal Rules of Civil Procedure governs protective orders.  In the Ninth

13  Circuit, issues concerning the scope of protective orders for confidential information entails a

14  balancing test of the conflicting interests between the protection of Rule 26(c) and the broad mandate

15  of the admissibility of information in discovery conferred by Rule 26(b)(1) of the Federal Rules of

16  Civil Procedure.  See, e.g., Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1472 (9th Cir.

17  1992), cert. denied, 506 U.S. 869 (1992) (holding that courts must balance the risk of inadvertent

18  disclosure of trade secrets to competitors against the risk that the protection of such confidential

19  information will impair prosecution of plaintiff's claims).  In this case, Phoenix argues that denying

20  its prosecution counsel from access to documents designated as highly confidential under the terms of

21  the protective order will greatly hinder Phoenix's ability to prosecute its claims.  Phoenix contends

22  that granting its prosecution counsel access to confidential information will not compromise Wells

23  Fargo's competitive advantage because the parties are not in direct competition in any industry

24  related to the patents-in-suit.  Phoenix further argues that because Wells Fargo has not asserted any

25  proprietary position, in terms of having its own patents in the area of speech recognition, it is highly

26  unlikely that any confidential information accessed by Gross would be usable by Gross to harm Wells

27  Fargo.  See Trojan Dec., Exh. 2; Gross Dec. ¶ 5.

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Setting aside the issue of prejudice to Phoenix for the moment, the court first considers the

2   substantive argument that Wells Fargo essentially has no basis for asserting the protective order

3   against Phoenix's outside prosecution counsel.  This argument fails to withstand scrutiny for a

4   number of reasons.  First, because Gross is currently involved in prosecuting continuation

5   applications of the patents-in-suit, the court finds it unrealistic to expect Gross to be able to wholly

6   compartmentalize his knowledge of Wells Fargo's confidential information and not let it influence

7   his current and ongoing prosecution duties to Phoenix.  To hold otherwise would place Gross in the

8   "untenable position" of having to limit his counsel to his client with respect to ongoing prosecution

9   strategies lest he improperly or indirectly reveal information obtained from Wells Fargo concerning

10   its alleged infringement of the patents-in-suit.  See Brown Bag, 960 F.2d at 1471.

11   Second, the fact that Wells Fargo and Phoenix are not direct competitors hardly forecloses the

12   inquiry.  Phoenix's allegation that Wells Fargo does not make or sell speech recognition systems

13   awkwardly sidesteps the fact that Wells Fargo uses speech recognition systems.  It is for this very

14   reason that Wells Fargo has been brought to the table in this litigation.  Thus, the very fact that Wells

15   Fargo is being sued by Phoenix for infringement of the patents-in-suit indicates that Phoenix believes

16   the parties have at least some overlapping interest in the same industry.  This belief, be it meritorious

17   or not, is one that could certainly affect the competitive nature of Wells Fargo's business, as

18   discussed further below.  At a minimum, the court finds that Wells Fargo's concern that Gross could

19   use the knowledge gained in this litigation to prosecute future related patents to Wells Fargo's

20   disadvantage is valid and deserving of protection.

21   Phoenix's reliance on U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984) to

22   conclude that there is no automatic exclusion of prosecution counsel from assisting in the litigation of

23   a prosecution client serves to set up a straw man.  In U.S. Steel, the Supreme Court concluded that a

24   court should examine the factual circumstances of any counsel's relationship, outside and in-house

25   counsel alike, to the party demanding access.  Id. at 1468.  Wells Fargo never sought to disqualify

26   Phoenix's prosecution counsel from an active role in this litigation as a matter of course.  Wells

27   Fargo's brief explicitly stated that it was not advocating a *per se* bar on patent prosecutors assisting

28   with litigation but rather a selective and specific bar based on the factual circumstances surrounding

1   Gross' involvement with Phoenix in the relevant field of the present litigation and his continued

2   prosecution of patents claiming priority and benefit from the patents-in-suit, all of which is consistent

3   with the case law cited by Phoenix.[3]

4          Furthermore, a crucial factor in the U.S. Steel case was whether in-house counsel was

5   involved in "competitive decision-making;" which the Court explained meant advising on business

6   decisions "made in light of similar or corresponding information about a competitor." Id. at 1468 n. 3.

7   In this case, Wells Fargo's concern is that Gross' ongoing involvement in the prosecution of

8   continuation applications of the patents-in-suit leave open the door to permitting him to tailor the

9   claims in the continuation applications to cover specific, known activities that are revealed to him

10  through the course of discovery in this litigation.  The court is well aware that continuation

11  applications allow patentees and their prosecution counsel the opportunity to monitor the marketplace

12  and respond by drafting and prosecuting claims that cover discovered activities.  In this vein, several

13  courts have concluded that patent prosecution is, by its very nature, a form of competitive decision-

14  making because patent attorneys can control the nature and scope of a patented invention.  See, e.g.,

15  In re Papst Licensing, 2000 WL 554219, *3 (E.D. La. 2000); Mikohn Gaming Corp. v. Acres Gaming

16  Inc., 50 U.S.P.Q.2d 1783, 1784 (D. Nev. 1998).  Other courts have extended the conclusion to hold

17  that patent counseling is also a form of competitive decision-making if it relates broadly to the scope

18  of a patented invention.  See, e.g., Chan v. Intuit, Inc., 218 F.R.D. 659, 661-662 (N.D. Cal. 2003) ("if

19  advice related to patent prosecution is defined as competitive decision-making . . . then advice on the

20  scope of patent claims must also be defined as competitive decision-making.").

21          Based on the foregoing logic, the court finds that Gross is indubitably involved in the sort of

22  decision-making that disqualifies him from having access to Wells Fargo's confidential information.

23  This inquiry is far simpler on the present facts than in cases that grapple with the risk of inadvertent

24  disclosure, such as Brown Bag and Mikohn.  Here, the court need not consider how realistic it may or

25  may not be to expect the prosecutor's knowledge of the defendant's technology will not influence his

26  current and ongoing prosecution duties to his client, because of Phoenix's explicit acts.  Phoenix has

27  already crossed the line and used Gross for more than just patent prosecution in this case—Gross

28  wrote several letters to Wells Fargo seeking to induce Wells Fargo to take a license to the Phoenix

patents, stating that "[s]everal of [Phoenix's] pending publications also appear to have claims which read on your system. . . ".  See First Paige Dec., Exh. B at 3.  Pending publications contain patent claims that are in the midst of prosecution and can be amended at any time up until patent issuance. Phoenix has effectively stipulated that it is trying to get future issued claims that read upon the technology used by Wells Fargo.  Under these circumstances, the court finds disingenuous Phoenix's argument that Brown Bag and other cases relied on by Wells Fargo are inapposite because they involve direct competitors, where the fear of inadvertent disclosure is warranted.  Gross' letters provide a formal and explicit written assurance that the fear of disclosure is warranted in this case and so the case law applies.

Having determined that Wells Fargo has a valid risk of harm concerning the disclosure of its confidential information to Phoenix, the court must now balance this against the risk that the protection of such confidential information will impair the prosecution of Phoenix's claims.  Phoenix argues that such terms would effectively preclude Gross from assisting Phoenix with this litigation and Phoenix asserts it would be greatly prejudiced if denied the ability to rely on the service of its only patent prosecution attorney for the remainder of the case.  Phoenix counters that Wells Fargo would not suffer anything more than minor or speculative harm because the parties are not in direct competition and whatever information Gross receives could not be used for anticompetitive purposes to harm Wells Fargo.  Phoenix further argues that because Wells Fargo has not asserted any proprietary position, in terms of having its own patents in the area of speech recognition, it is highly unlikely that any confidential information accessed by Gross would be usable by Gross to harm Wells Fargo.

The court is not persuaded by any of these arguments.  The case law requires restricting Gross' access to confidential information in this litigation.  Moreover, Phoenix has put itself in harms way by using Gross for more than patent prosecution already.  This is not a case that hinges on the extent of good faith Gross might exercise in parceling out his knowledge of Wells Fargo's secret technology from his prosecution and related counseling duties to Phoenix.  Pandora's Box has already been opened and Phoenix cannot continue to rely on Gross in the manner to which it has been come accustomed.  The court finds the potential harm to Wells Fargo from inadvertent or advertent

United States District Court

For the Northern District of California

1  disclosure of its confidential information outweighs the hardship that would befall Phoenix if its

2  prosecution counsel were disqualified or restricted to some extent in this case.

3       The court leaves the choice to Phoenix.  If it wishes to continue to retain the services of Gross

4  as patent prosecution counsel, a prosecution bar must be inserted in the protective order.  However, if

5  Phoenix firmly believes it would be unduly depriving itself of the ability to press its claims in this

6  litigation without the assistance of Gross, Phoenix has the option to have Gross cease prosecuting

7  patents for Phoenix during the litigation and for a period of one year thereafter, as has been proposed

8  by Wells Fargo.  The court finds this length of time reasonable and its subject matter scope

9  appropriate given the size of the company and the related field of Phoenix's other patents and patent

10 applications.  See, e.g., Chan, 218 F.R.D. at 662 (limiting bar to prosecution activities for counsel

11 receiving confidential information until two years after trial); Interactive Coupon Marketing Group,

12 Inc. v. H.O.T! Coupons, L.L.C., 1999 WL 618969 at *4 (N.D. Ill. 1999) (limiting prosecution bar

13 until one year after conclusion of the litigation); Davis v. AT&T Corp., 1998 WL 912012 at *3

14 (W.D.N.Y. 1998) (limiting bar to prosecuting patents in the subject field until two years after

15 termination of the litigation); Medtronic, Inc. v. Guidant Corp., 2001 WL 34784493 at *5 (D.Minn.

16 2001) (limiting prosecution bar for one year).

17 III.    Settlement Privilege

18       Phoenix has produced to Wells Fargo over thirty letters Phoenix sent to third-party companies

19 reflecting initial offers to license certain of Phoenix's patents.  Phoenix asserts that it is currently

20 engaged in licensing negotiations with several of those companies and has refused to produce further

21 documentation relating to settlement discussions.  Wells Fargo seeks to compel production of all of

22 Phoenix's communications with the third-party companies relating to license/settlement negotiations

23 concerning the patents-in-suit, including documents relating to Phoenix's enforcement of the patents-

24 in-suit that are currently listed as privileged in Phoenix's privilege log as well as responsive

25 communications relating to Phoenix's stipulation with Intervoice, which are not logged.  Phoenix

26 contends that the information sought is not discoverable because it is protected under a settlement

27 privilege.

28

16

1    The scope of discovery permitted by the Federal Rules of Civil Procedure is very broad.

2    Hickman v. Taylor, 329 U.S. 495, 507 (1947).  Discovery is only limited to information that is not

3    privileged and that is relevant to the claim or defense of any party.  Fed. R. Civ. P. 26(b)(1).

4    "Relevant information need not be admissible at trial if the discovery appears reasonably calculated

5    to lead to the discovery of admissible evidence."  Id.  Phoenix argues that the information sought by

6    Wells Fargo is both privileged and not relevant to this litigation.  Phoenix's position is that it has no

7    obligation to disclose communications from any other third parties prior to reaching an agreement

8    and signing a license with such parties, because all documents relating to settlement negotiations are:

9    (1) protected from discovery based on a "settlement privilege," whose policy is embodied in Federal

10   Rule of Evidence 408; and (2) generally not relevant to other litigation because any positions taken

11   by the parties prior to any final agreement are insignificant and intrusive and will likely not constitute

12   admissible evidence.   Because the issue of relevance is a simpler one in this case, the court addresses

13   Phoenix's arguments in reverse order.

14        A.    Relevance

15        Phoenix draws a distinction between license/settlement agreements and settlement

16   negotiations, and asserts that documents relating to the negotiations of settlement do not impact on

17   substantive patent issues and have no probative value.  Wells Fargo disagrees, arguing that Phoenix's

18   correspondences with third parties that it has accused of infringement and made offers to license its

19   patents are relevant because they could be material to several aspects of the merits of this case.

20   Specifically, Wells Fargo argues that Phoenix's communications are relevant to show what Phoenix

21   believes infringes the patents-in-suit, what Phoenix would consider a reasonable royalty rate for the

22   patents-in-suit, and that third-party responsive communications could potentially reveal evidence of

23   prior art systems that existed before Phoenix filed its patents.  In its supplemental brief Wells Fargo

24   also argues that Phoenix's communications could also possibly contain admissions against interest if

25   Phoenix makes infringement assertions to third parties in a manner that contradicts its assertions in

26   this litigation.

27        Based on the record at hand, the court is hard pressed to conclude that the information sought

28   by Wells Fargo is not reasonably calculated to lead to the discovery of admissible evidence and,

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  hence, is irrelevant to the litigation.  There are a multitude of ways in which Phoenix's

2  correspondences with third parties related to license negotiations could be relevant to this litigation,

3  as so noted by Wells Fargo.  Fundamentally, the third-party negotiations could help Wells Fargo

4  ascertain the extent of its liability to Phoenix and to formulate an appropriate litigation strategy.  This

5  court is not persuaded by Phoenix's arguments that licensing or settlement negotiations themselves

6  are not relevant because the final agreement reflects the culmination of the negotiations and that

7  positions taken by the parties prior to reaching a final agreement are therefore insignificant.  Nothing

8  in the record before the court suggests that the information contained in negotiation communications

9  would be duplicative or cumulative of other discovery that Phoenix has already provided to Wells

10  Fargo.  Indeed, Phoenix admits it has only reached a final agreement with one party.  What is more,

11  Phoenix's position fails to acknowledge that licensing and infringement positions may be taken and

12  discarded or otherwise changed over time based on a myriad of extrinsic factors that could well be

13  relevant to another party accused of infringement.  See, e.g., In Georgia-Pacific Corp. v. U.S.

14  Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970) (including as evidentiary facts relevant in

15  royalty determinations for patent licenses the patentee's marketing program to maintain his

16  monopoly, the royalties received by the patentee from other licensees and the non-exclusive bounds

17  of the license).

18        Phoenix appears to be conflating the standard for relevance as a discovery threshold with the

19  standard for the admissibility of evidence at trial.  "Relevancy for discovery is flexible and has a

20  broader meaning than admissibility at trial."  See Eggleston v. Chicago Journeymen Plumbers' Local

21  Union No. 130, U.A., 657 F.2d 890, 903 (7th Cir. 1981).  The court considers this further in its

22  privilege analysis, below.  But, even if the third-party negotiations addressing the amount of liability

23  were to be protected by a privilege, the court is still unwilling to close the door to the reasonable

24  possibility that admissible evidence will be generated by the dissemination of third-party

25  licensing/settlement negotiations.  See, e.g., U.S. v. American Soc. of Composers, Authors and

26  Publishers, 1996 WL 157523, *2 (S.D.N.Y. 1996) (noting the extensive use at trial of documents

27  concerning past fee negotiations and finding such third-party information "potentially relevant under

28  the liberally read standards of Fed. R. Civ. P. 26(b)(1)").  The court need not determine at this time

United States District Court

For the Northern District of California

1  whether the evidence will actually end up being admissible in this litigation.  See Abbott Diabetes

2  Care Inc. v. Roche Diagnostics Corp., 2007 WL 4166030, *3 (N.D.Cal. 2007) ("The question before

3  the Court today is the discoverability, not the admissibility, of the settlement agreement.") This court

4  finds that, at a minimum, discovery of licensing/settlement negotiations is reasonably calculated to

5  lead to relevant, admissible evidence.  Accordingly, the requested documents are discoverable so

6  long as they are not privileged.

7        B.    Privilege

8        The court disagrees with Phoenix's contention that Federal Circuit law controls this inquiry.

9  Because this discovery issue is not one that occurs in the unique context of patent litigation, and

10  because settlement discussions are themselves not a substantive patent law issue, the court finds that

11  the law of the Ninth Circuit sets the standard to evaluate the adequacy of the asserted privilege.  See,

12  e.g., Dorf & Stanton Communs., Inc. v. Molson Breweries, 100 F.3d 919, 922 (Fed. Cir. 1996)

13  ("Because an order compelling discovery is not unique to patent law, we agree that [regional circuit]

14  law must be considered.").  Phoenix's admission that settlement negotiations themselves "do not

15  impact on substantive patent issues" corroborates this finding.  Pl.'s Brief Re Settlement Privilege

16  3:27-4:1.

17        In the Ninth Circuit, a broad scope of discovery is favored because "wide access to relevant

18  facts serves the integrity and fairness of the judicial process by promoting the search for truth."

19  Epstein v. MCA, Inc., 54 F.3d 1422, 1423 (9th Cir. 1995).  According to Phoenix, several courts

20  have held that negotiations leading up to settlement are not discoverable, the rationale being that

21  allowing disclosure could chill settlement negotiations and ultimately settlement. Phoenix argues that

22  under the "settlement privilege," parties in negotiation should be allowed to engage in an open

23  discussion without fear that the negotiations will be discoverable.  Phoenix's argument, essentially, is

24  that the settlement negotiations are presumptively inadmissible at trial under Rule 408 of the Federal

25  Rules of Evidence.[4]  However, the cases on which Phoenix relies are distinguishable from the instant

26  case involving third-party patent license negotiations, in that they involve situations where the parties

27  held a legitimate and explicit expectation that the settlement documents would remain confidential.

28  See, e.g., Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc., 332 F.3d 976, 978 (6th Cir.

United States District Court

For the Northern District of California

1  2003) (holding privileged settlement negotiations that occurred under a confidentiality order); <u>Abbott</u>

2  <u>Diabetes Care</u>, 2007 WL 4166030 at *1 (holding that portions of a settlement agreement could be

3  redacted to preserve the parties' expectation of confidentiality); <u>American Soc. of Composers</u>, 1996

4  WL 157523 at *2 (holding that third-party license negotiating statements must be produced but could

5  be partially redacted to address the confidentiality expectations of all parties and third-party concerns

6  about the context of disclosure in another action).  A bilateral (or multilateral) expectation of

7  confidentiality is what forms the essential basis of the pro-settlement policies underlying Rule 408

8  and is currently absent from the present record involving licensing negotiations with third-party

9  companies.

10        Rule 408 of the Federal Rules of Evidence states that evidence of statements made in

11  compromise negotiations are "not admissible on behalf of any party, when offered to prove liability

12  for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach

13  through a prior inconsistent statement or contradiction . . . ."  Fed. R. Evid. 408(a).  The prohibition

14  on using compromise negotiations is therefore limited and the rule does not bar the admission of such

15  negotiations for other permissible purposes.  Indeed, subdivision (b) of the rule provides that "[t]his

16  rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision

17  (a)" and thereafter provides examples of various permitted uses, including proving a witness's bias or

18  prejudice and negating a contention of undue delay.  Fed. R. Evid. 408(b).  Thus, at least some

19  communications made in furtherance of licensing/settlement negotiations are discoverable, as Rule

20  408 permits their use in some aspects of trial.

21        The court recognizes the right of parties to contract for confidential settlement terms and the

22  important policies underlying Federal Rule of Evidence 408 to encourage settlement.  However, Rule

23  408 does not warrant protecting settlement negotiations from discovery.  On its face, the rule applies

24  to the admissibility of evidence at trial, not to whether evidence is discoverable.  <u>See, e.g.</u>,

25  <u>Morse/Diesel, Inc. v. Fidelity and Deposit Co.</u>, 122 F.R.D. 447, 449 (S.D.N.Y. 1988) (holding that

26  Rule 408 only applies to the admissibility of evidence at trial and does not protect such evidence from

27  discovery).  Even the cases Phoenix cites acknowledge this basic distinction.  <u>See, e.g.</u>, <u>American</u>

28  <u>Soc. of Composers</u>, 1996 WL 157523 at *1 ("The rule limits the admissibility of settlement terms or

United States District Court

For the Northern District of California

1  proposals and of other representations made in the course of settlement discussions, but it does not

2  purport to preclude discovery of such agreements or statements.")

3       The Advisory Committee Notes to Rule 408 explain that "evidence, such as documents, is not

4  rendered inadmissible merely because it is presented in the course of compromise negotiations if the

5  evidence is otherwise discoverable. A party should not be able to immunize from admissibility

6  documents otherwise discoverable merely by offering them in a compromise negotiation." See Fed.

7  R. Evid. 408, advisory committee's note.  Moreover, evidence of facts disclosed during compromise

8  negotiations is not inadmissible by virtue of having been first disclosed in the compromise

9  negotiations.  Accordingly, facts regarding the very occurrence of Phoenix's threats to third parties

10  are not inadmissible, nor is the substance of settlement discussions *per se* irrelevant to a proceeding

11  in federal court, because Rule 408 itself authorizes the admission into evidence of such materials

12  except for limited purposes.  Indeed, courts have reasoned that Rule 408 "does not require any special

13  restriction on Rule 26 because discovery rules do not affect admissibility." Bank Brussels Lambert v.

14  Chase Manhattan Bank, 1996 WL 71507, *3 (S.D.N.Y. 1996).  Notably, the 2006 amendment to Rule

15  408 was made with the intent to retain the extensive case law finding the rule inapplicable when

16  compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount

17  of a disputed claim.  See Fed. R. Evid. 408, advisory committee's note, citing, e.g., Coakley &

18  Williams v. Structural Concrete Equip., 973 F.2d 349 (4th Cir. 1992) (evidence of settlement is not

19  precluded by Rule 408 where offered to prove a party's intent with respect to the scope of a release);

20  Athey v. Farmers Ins. Exchange, 234 F.3d 357 (8th Cir. 2000) (admitting evidence of settlement offer

21  by insurer to prove insurer's bad faith); Uforma/Shelby Bus. Forms, Inc. v. NLRB, 111 F.3d 1284

22  (6th Cir. 1997) (threats made in settlement negotiations were admissible; Rule 408 is inapplicable

23  when the claim is based upon a wrong that is committed during the course of settlement

24  negotiations).

25       The cases upon which Phoenix relies to argue that the public policy behind Rule 408 is to

26  favor compromise and settlement of disputes by shielding a party's negotiating strategies or tactics do

27  not comport with the present facts.  In this case, Wells Fargo is seeking production of documents

28  reflecting licensing negotiations between Phoenix and other third-party companies accused of

infringing the patents-in-suit.  The potential that damaging disclosures may interfere with the third-party negotiators' candor in such discussions or otherwise discourage third-parties from venturing into licensing/settlement talks is not sizeable.  If anything, the disclosure of such documents could assist the third parties in fostering discussions with other alleged infringers and helping them to ascertain the extent of their own relative liability to Phoenix.

In a sleight of hand, Phoenix argues that any and all evidence of settlement negotiations should be protected because its disclosure could interfere with the party's candor or willingness to venture into settlement discussions.  However, Phoenix's statement, which was copied verbatim from American Soc. of Composers, 1996 WL 157523 at *2, omitted the beginning of the sentence which reads "[d]epending upon the nature of the information . . . ."  The court reminds Phoenix that Wells Fargo seeks the documents during the course of discovery and is not requesting admission of evidence at trial.  Phoenix has failed to meet its burden to put forth a persuasive case for a settlement privilege that will protect third-party settlement negotiations from discovery.  The court finds no convincing basis for Phoenix's proposition that its licensing negotiation communications are protected from discovery by a settlement privilege, embodied in Federal Rule of Evidence 408.

Further, the court lifts its previous oral prohibition on third-party contact made during the September 11, 2008 telephonic conference.  If Wells Fargo wishes to seek production of the negotiation documents that reflect any representations or strategies that were considered by the third-party companies in response to Phoenix's license offers, Wells Fargo may request such documents directly from those third parties.

Finally, with regard to the Intervoice stipulation, the court reminds Phoenix that it ordered production of the Intervoice stipulation and all communications Phoenix had with Intervoice's counsel regarding that stipulation during the September 11, 2008 telephonic conference and expects Phoenix to comply with this order.

United States District Court

For the Northern District of California

1   <u>CONCLUSION</u>

2

3     **IT IS ORDERED** that Phoenix shall produce all responsive documents within the scope of

4 waiver of attorney-client privilege as defined herein.

5     **IT IS FURTHER ORDERED** that the parties, in preparing a stipulated protective order,

6 shall prohibit dissemination of highly confidential information pertaining to the subject matter of the

7 patents-in-suit to attorney Gross, unless he agrees to cease prosecuting Phoenix patent applications

8 during the pendency of this case and for one year after the conclusion of this litigation, including any

9 appeals.  The parties are also ordered to rely to the greatest extent possible on this court's form

10 protective order.

11     **IT IS FURTHER ORDERED** that Phoenix shall immediately produce (1) all documents

12 related to the negotiation of licenses of, and licensing of, the patents-in-suit with any third party

13 including, but not limited to, the parties listed in Phoenix's privilege log; and (2) all documents

14 related to Phoenix's stipulation with Intervoice in the related <u>Phoenix v. Sony</u> action,

15 3:07-cv-002112-MHP.

16

17

18 Dated:  October 22, 2008

19                                   MARILYN HALL PATEL

20                                   United States District Court Judge
Northern District of California

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

**ENDNOTES**

1.      In its supplemental brief on Phoenix's "settlement" privilege claim, Wells Fargo amended its argument to reflect Phoenix's updated privilege log.  Wells Fargo still contends that all of the withheld documents with the amended privilege log descriptions of "infringement contentions," "presentation re: license offer" and "chart re: license offer" should still be ordered disclosed because they are not privileged and relevant to this litigation. The court was not moved by Wells Fargo's original objections to the privilege log descriptions supplied by Phoenix and likewise fails to find the supplemental objections of much consequence, but they are so noted nonetheless.

2.      Indeed, Phoenix said in so many words during the September 11, 2008 telephonic hearing that the voluntary disclosure of the patent application drafts was "probably bad lawyering." See Tr. 10:5-9.

3.      The only other appellate decision on which Phoenix relies to argue that a patent attorney is not involved in competitive decision-making is In re Sibia Neurosciences, Inc., 1997 WL 688174 (Fed. Cir. 1997) (unpublished).  Because the Federal Circuit deemed its opinion unsuitable for publication, this court has not considered it and finds improper Phoenix's contention that any "rationale established by the Federal Circuit" in Sibia controls the instant inquiry.

4.      At least one of the cases on which Phoenix relies considers a settlement privilege under Rule 501 of the Federal Rules of Evidence, which authorizes the federal courts to determine new privileges by examining "common law principles ... in the light of reason and experience."  Fed. R. Evid. 501. However, because Phoenix did not explicitly raise this basis for a privilege in its brief, the court will not consider the alleged privilege on that catchall basis.

United States District Court

For the Northern District of California

24